UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

UNITED STATES OF AMERICA                                       PLAINTIFF

v.                                        CRIMINAL NO. 3:16-CR-148-TBR

ELIAS ESTEPHANE                                        DEFENDANT

## **SENTENCING MEMORANDUM**

*ELECTRONICALLY FILED*

The United States of America, by counsel, Assistant United States Attorney Amanda Gregory, files its memorandum in support of sentencing in this action currently scheduled for February 13, 2018. The United States does not plan to put on any witnesses at the hearing.

The United States takes the position that the appropriate guidelines application for Count 1 of the Indictment is an adjusted offense level of 22. As Defendant has a Criminal History Level of II, this results in a sentencing range of 46 to 57 months. Considering this sentencing range, and the sentencing factors under Title 18, United States Code, Section 3553(a), it is the position of the United States that a sentence of 52 months, at the middle of the sentencing range, is appropriate.

## **I. BACKGROUND AND OFFENSE CONDUCT**

The Defendant was the owner and manager of the Meat Store, located at 1066 South 28th Street. The Meat Store opened around 2011, then closed in July 2016, when the building collapsed due to disrepair and neglect, killing one of the employees. In 2013, he opened another meat and poultry store, known as the Meat Store 2, located at 4835 Poplar Level Road. The Meat Store 2 closed in 2015. The Defendant submitted applications for both stores to become approved retailers with the Supplemental Nutrition Assistance Program, also known as "SNAP" or the food stamp

program. Prior to opening the Meat Store, the Defendant owned several other meat and poultry stores, which were also approved SNAP retailers.

Each time that the Defendant submitted an application for a store to be an approved SNAP retailer, he signed certifications acknowledging the SNAP restrictions, including the restriction on trading cash for SNAP benefits and accepting SNAP benefits as payment on credit accounts. After each store is accepted as an approved SNAP retailer, USDA sends out training materials regarding the program, including these program restrictions. At trial, the Defendant acknowledged that he understood that the SNAP program prohibited the exchange of cash for SNAP benefits.

Beginning as early as January 2012, the SNAP transaction history for the Meat Store revealed numerous suspicious transactions. Based on these transactions, and the volume of and amount of SNAP redemptions at the Meat Store, USDA and FBI opened a joint investigation into the Meat Store, which involved undercover transactions and interviews with customers and employees.

From in or around and between January 2012 and July 2016, the Defendant exchanged cash for SNAP benefits, in violation of SNAP rules. He generally paid individuals 50 cents on the dollar for their benefits, unless it was someone with whom he had a close relationship. If an individual came in and only sought to sell SNAP benefits, he would give them meat "on the house" as they were leaving the store so that it would not appear they were leaving empty-handed. While the Defendant has attempted to characterize these transactions as sales, customers and undercover buyers testified that they did not ask for or choose the meat they were offered. In one of the undercover recordings, the Defendant can be heard referring to the meat as "on the house."

From January 2012 through July 2016, the total for SNAP transactions at the Meat Store was $2,182,547.85. From January 2012 through July 2016, the statewide average SNAP

transaction amount for all meat and poultry stores in the state, including the Meat Store, was $43.75. During the same period, the average SNAP transaction amount for the Meat Store was $66.15. Several people testified that the Meat Store's prices were cheaper than average.

On August 17, 2016, federal agents interviewed the defendant's son, Anthony Estephane, who worked at the Meat Store. During this interview, Anthony Estephane estimated that 15% of the EBT sales at the Meat Store involved an exchange of cash for SNAP benefits. On several occasions in fall of 2017, federal agents interviewed Howard Chisem, a former employee of the Meat Store. During the second interview, Chisem estimated that 35% of SNAP transactions at the Meat Store involved the exchange of meat for cash. Later, during trial prep, when asked about his earlier estimate of 35% for fraudulent SNAP transactions, Chisem said the percent of fraudulent transactions was "around there," around 20% to 30%.

## II. GUIDELINES CALCULATION

Even in the post-*Booker* sentencing era, the United States Supreme Court and the Sixth Circuit Court of Appeals have reiterated the continued importance of the United States Sentencing Guidelines in the federal sentencing process. *See Gall v. United States,* 552 U.S. 38 (2007), and *United States v. Anderson*, 526 F.3d 319 (6th Cir. 2008). The *Anderson* court opined that

> [a]t the outset, we note that it is unclear that an error in determining the Guidelines recommendation can ever be considered harmless post- *Gall*. *Gall* clearly directed the focus of sentencing courts to the Guidelines. For instance, the Court held that a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. 128 S.Ct. at 596. "[T]he Guidelines should be the starting point and the initial benchmark," so as to ensure fair sentencing "administration and to secure nationwide consistency." *Id.* Furthermore, the Court held, "[t]he fact that 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Id.* at 596 n. 6. If the district

> court decides to sentence a defendant outside of the Guidelines range, then the district court "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. [The Court] f[ou]nd it uncontroversial that a major departure should be supported by a more significant justification than a minor one." *Id.* at 597. On appeal, the Courts of Appeals "must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range .... or failing to adequately explain the chosen sentence-including an explanation for any deviation from the Guidelines range." *Id.*

*Id.* at 329. The *Anderson* court further noted that such a focus on the guidelines "is consistent with the Court's other recent sentencing precedent" and went on to reference the decisions in *United States v. Booker*, 543 U.S. 220, 245-46, (2005), *Kimbrough v. United States*, 128 S.Ct. 558, 564 (2007), and *Rita v. United States*, 127 S.Ct. 2456, 2468 (2007), to include the opinions' respective references to the role of the guidelines. *Id.* In *United States v. Bistline*, 665 F.3d 758, 761 (6th Cir. 2012), the Sixth Circuit noted that, although advisory, the Sentencing Guidelines should still be "'the starting point and the initial benchmark' for choosing a defendant's sentence." *Citing Gall v. United States,* 552 U.S. at 49 (2007).

### A. Base Offense Level

The base offense level should be six. Count 1, which involves a violation of Title 7, United States Code, Section 2024(b), refers to Section 2B1.1 of the guidelines. Section 2B1.1(a)(2) provides for a base offense level of six, as the statutory maximum term of imprisonment for Section 2024(b) is less than 20 years.

### B. Specific Offense Characteristic – Loss Calculation

It is the United States' position that the approximate fraud loss in this matter is approximately $700,000, which results in a 14-point increase pursuant to U.S.S.G. § 2B1.1(b)(1)(H).

Under U.S.S.G. § 2B1.1(b)(1), the Court increases the offense level based on the amount of loss caused by the defendant's conduct, including the acts and omissions of others under U.S.S.G. § 1B1.3(a). Relevant to this matter, loss amount under the Guidelines is the "reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n. 3(A)(i). Here, the Defendant's bank account received monetary credits from the USDA in amounts equal to the benefits purchased for cash. While the Defendant then paid out half the value of the benefits to recipients in cash, the full value of the benefits is the amount that is used to calculate fraud loss. *See id.* at cmt. n. 3(F)(ii) ("In a case involving government benefits . . ., loss shall be considered to be not less than the value of the benefits obtained by the unintended recipients."); *United States v. Arnous*, 122 F.3d 321, 323 (6th Cir. 1997) ("When food stamp [benefits] are exchanged for cash," the loss "is the face value of the [benefits] exchanged."); *United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000).

The Court may determine facts relevant to guideline determinations by a preponderance of the evidence. *United States v. Gates*, 461 F.3d 703, 708 (6th Cir. 2006). In a case like this, it is impossible to determine the exact amount of the fraud loss. However, the court need not determine the loss amount in a financial crime with precision, but rather "need only make a reasonable estimate of the loss, given the available information." *United States v. Mickens*, 453 F.3d 668, 672 (6th Cir. 2006); *United States v. Brawner*, 173 F.3d 966, 971 (6th Cir. 1999) (approving loss calculations based on estimates of average fraud loss); USSG § 2B1.1, note 3(C).

In *United States v. Hassan*, the court approved a calculation based on "aggregated food stamp redemptions less actual food sales." *Id.* Where reliable figures (e.g., for "actual food sales") are not available, however, a "district court may make a reasonable estimate by extrapolating the average amount of loss from known data and applying that average to transactions where the exact

5

amount of loss is unknown." *United States v. Uddin*, 551 F.3d 176, 180 (2nd Cir. 2009). Courts have adopted loss calculations that compare the amount of SNAP redemptions at the target store with monthly level of redemptions at comparable food stores in the area. *See United States v. Sufi*, 456 Fed. Appx. 524, 528 (6th Cir. 2012) (upholding comparison average method because it provided an objective means of loss calculation*); United States v. Jarjis*, 551 Fed. Appx. 261, 263 (6th Cir. 2014) (affirming district court determination of loss through comparison method to similar stores in the local area and to stores statewide).

Using the comparison store method, the USDA compared the Meat Store's monthly SNAP redemptions against the average monthly at three other meat and poultry stores in a 15-mile radius. *See* Attached Exhibit. Using this method, the estimated fraud loss was $2,036,081.

In pretrial motions, the Defendant objected to the introduction of evidence of total SNAP sales at comparison stores in proving guilt. *See* DN 32. In the proposed questions for voir dire listed in the Defendant's trial brief, the Defendant made the point that the Meat Store was located in the west end of Louisville, which was likely to have a larger number of SNAP recipients than other parts of Louisville. *See* DN 31 at 8. If this was true, that could account for a larger number of SNAP transactions at the store, which would in turn increase the total monthly SNAP sales. However, an increased number of number of SNAP customers would not result in an increase in the store's average SNAP transaction amount. For the charged period, the average SNAP transaction amount for meat and poultry stores across all of Kentucky was $43.75. During the same period, the average SNAP transaction amount for the Meat Store was approximately 51% higher, at $66.15, meaning that the average SNAP transaction amount statewide for meat and poultry stores was approximately 33.9% of the Meat Store average SNAP transaction amount.

Assuming this difference is attributable to fraud, the fraud loss is 33.9% of the Meat Store's total SNAP sales for the period, or $739,883.77.

In the Defendant's objections to the PSR, the Defendant argued for a loss calculation based on comparing the cost of goods sold listed on the Meat Store's tax returns to the Defendant's total SNAP sales. There are several problems with this approach. First, the Defendant's total SNAP sales are not indicative of the Defendant's total sales at the Meat Store. Indeed, whereas total SNAP sales for the charged period are approximately $2,182,447, the total gross receipts listed on the Meat Store's tax returns for the same period is $2,672,865. Second, the "cost of goods" listed on the Meat Store's tax returns, along with the gross receipts listed on the tax returns, are self-reported by the Defendant, and their accuracy has not been proven. Prior to trial, the Defendant turned over a variety of receipts to represent the costs of goods sold. When USDA reviewed the receipts and added them up, they fell short of the amount listed for costs of goods on the tax returns. The difference ranged from approximately $14,000 to over $200,000 depending on the year. Further, the numbers on the Defendant's tax returns are suspect on their face, given that they represent a wide-ranging markup over the years. If the numbers on Defendant's tax returns for costs of goods and gross receipts are accurate, in 2012, the markup for products was 83% while in 2016, the markup was 27%. Finally, this analysis does not take into account the fact that the Defendant gave meat away for free. Several people at trial testified that the Defendant not only provided meat that had not been requested to cover up sales of SNAP benefits, but also gave away meat when people had no money.

### C. Abuse of Trust

It is the United States' position that the "abuse of trust" enhancement should apply, which results in a two-point increase pursuant to U.S.S.G. § 3B1.3.

7

The Sentencing Guidelines provide that a defendant's calculated offense level should be increased by two levels if "the defendant abused a position of public or private trust … in a manner that significantly facilitated the commission or concealment of the offense." USSG § 3B1.3. The commentary to the provision provides that:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Personal holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

*Id*. App. Note 1.

"The level of discretion accorded an employee is to be the decisive factor when deciding if an employee holds a position of trust" within the meaning of § 3B1.3. *United States v. Hudson*, 491 F.3d 590, 595 (6th Cir. 2007). The position of trust arises when an organization makes itself vulnerable to someone in a particular position, ceding to that person's judgment some control over their affairs. *United States v. Gilliam*, 315 F.3d 614, 618 (6th Cir. 2003).

Courts have routinely applied the abuse-of-trust enhancement to the owners of stores fraudulently redeeming food stamps. *See*, *e.g.*, *United States v. Kasi*, 348 F. App'x 689 (2nd Cir. 2009) (unpublished). The Second Circuit held in that case:

> We agree with the District Court that the case for the abuse-of-trust enhancement was "open and shut." Kasi, but not his co-defendants, was the person who received authorization from the USDA to participate in the food stamp program and was trained to ensure compliance with the program's requirements. Furthermore, Kasi was entrusted by the USDA with the primary responsibility to help prevent fraud and abuse.

*Id*. at 693, *citing United States v. Allen*, 201 F.3d 163, 166 (2nd Cir. 2000) (whether someone occupies a position of trust "turns on the extent to which the position provides the freedom to commit a difficult-to-detect wrong"). *See also United States v. Sarsour*, 271 F. App'x 923, 927-28 (11th Cir. 2008) (enhancement properly applied because store owner "Sarsour had to receive

8

approval from the USDA to participate in the food stamp program, and that approval allowed him to engage in food stamp fraud."); *United States v. Blankenship*, 134 F. App'x 363 (11th Cir. 2005) ("the district court correctly found that Blankenship held a position of trust in that he was entrusted by the federal government to administer the food stamp program, and to follow the rules of the food stamp program. Blankenship was in a position of significant managerial discretion, in that he was the only employee of [the store] and was authorized to obtain the EBT food stamp machine."); *compare United States v. Sufi*, 455 Fed. Appx. 672, 677-78 (6th Cir. 2012) (upholding upward departure of 27 months based in part on the idea that the case involved an "abuse of trust," where the 3B1.3 enhancement was not explicitly considered by the lower court or the appellate court).

Like the store owners in *Kasi*, *Sarsour*, and *Blankenship*, the Defendant was the sole owner and manager of the Meat Store. After going through the application process, which required that he promise to abide by the program rules, he was entrusted by USDA with the responsibility of administering the program and preventing fraud. Unlike many other food stamp defendants, the Defendant had gone through this process many times, getting stores other than the Meat Store approved as SNAP retailers. Unlike a "mere bank teller," the defendant's discretion at the Meat Store was unfettered. He managed other employees, though he was the only one who purchased SNAP benefits. Because the defendant abused a position that accorded him the freedom to commit a difficult-to-detect wrong, his offense level should be increased by two levels.

### D. Acceptance of Responsibility

The Defendant should not receive an acceptance of responsibility reduction under U.S.S.G. § 3E1.1. In his objections to the PSR, the Defendant argued he should receive points for acceptance of responsibility because he took the stand at trial and "admitted" to certain elements

9

of the offense. These admissions took place on cross-examination, and at times, only after an initial denial. Further, despite these admissions, the Defendant insisted his behavior was not fraudulent. Finally, despite being apprised well in advance of trial of the overwhelming evidence against him, the Defendant forced the United States to take on the time and expense of a trial. He should not receive any points for acceptance of responsibility.

### E.  Offense Level

Recognizing that the Sentencing Guidelines are the starting point for determining an appropriate sentence, and using the above-cited provisions, the appropriate guidelines offense level is 22.

## III.  CRIMINAL HISTORY

The United States concurs with the accuracy of the Criminal History Category calculation of the United States Probation Office. Defendant has two criminal history points and is a Criminal History Category II.

## IV.  18 U.S.C. § 3553(a) FACTORS

This Court must ultimately affix a sentence which is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2). Title 18, United States Code, Section 3553(a) guides the Court regarding factors to consider when imposing a sentence. That section directs courts to consider the following:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed;
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

10

      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for--

      (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

      . . .

(5)     any pertinent policy statement--

      . . .

(6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims of the offense.

The Defendant stands convicted of food stamp or SNAP fraud. The sentence imposed in this action should adequately reflect the seriousness of the offense along with the characteristics of the Defendant and provide a just punishment no greater than necessary. Based on these factors, as outlined below, the United States recommends a sentence of 52 months, at the middle of the appropriate sentencing guideline range.

The nature and circumstances of the offense are serious. SNAP is a program designed to help the poorest members of society pay for a basic necessity – food. Fraud on the SNAP program in the form trading cash for benefits has far-reaching effects. First, it undermines public confidence in SNAP, which endangers the program as a whole. Second, it deprives SNAP recipients (albeit with their consent) of money that was intended to be used for food. Finally, it unjustly enriches the SNAP retailers, who have sworn to abide by the restrictions of the program, and been entrusted with government funds on that basis.

The Defendant committed this offense over a long period of time, stealing approximately $700,000 from the USDA. This number does not include any fraud that may have occurred at the Meat Store 2 or the Defendant's prior stores. The Defendant pocketed approximately half of the

11

$700,000, as many people testified he generally paid 50 cents on the dollar for benefits. He also took affirmative steps to avoid discovery by making sure that people who came into the store to solely to sell benefits left carrying meat so it would not appear suspicious.

As SNAP retailers are provided with trust and discretion, SNAP fraud is difficult to detect. As such, it is important for any sentence to deter fraud among other SNAP retailers.

A sentence of 52 months would satisfy the sentencing factors. That sentence would account for the seriousness of the offenses and provide needed deterrence to others and protection of the public. A sentence below the Guidelines would discount the protracted, damaging nature of the Defendant's conduct.

## V.  CONCLUSION

For the reasons set forth herein, the United States respectfully requests that the Court apply the Sentencing Guidelines, as outlined above, follow the statutory directives set out in 18 U.S.C. § 3553(a), and impose a sentence of 52 months, which is the middle of the sentencing range.

Respectfully submitted,

RUSSELL M. COLEMAN
United States Attorney

/s/ Amanda E. Gregory
Amanda E. Gregory
Stephanie Zimdahl
Assistant U.S. Attorneys
717 West Broadway
Louisville, Kentucky  40202
PH:  (502) 582-5016
FAX: (502) 582-5097

## CERTIFICATE OF SERVICE

      I hereby certify that on February 5, 2018, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to counsel for the defendant.

                                          s/ *Amanda E. Gregory*
                                          Amanda E. Gregory

                                          Assistant U.S. Attorney