1          UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF KENTUCKY
2               LOUISVILLE DIVISION

3

UNITED STATES OF AMERICA,      )    Case No. 3:16-CR-148
4                              )
           Plaintiff,          )
5                              )
       VS.                     )
6                              )
ELIAS ESTEPHANE                )
7                              )    February 13, 2018
           Defendant.          )    Louisville, Kentucky
8

9                    * * * * *
               TRANSCRIPT OF PROCEEDINGS
10        BEFORE HONORABLE THOMAS B. RUSSELL
             UNITED STATES DISTRICT JUDGE
11
                     * * * * *
12
APPEARANCES:
13
For United States:        Amanda Gregory
14                        Stephanie Zimdahl
                          U.S. Attorney's Office
15                        717 West Broadway
                          Louisville, KY 40202
16
For Defendant:            David Lambertus
17                        600 West Main Street
                          Louisville, Kentucky  40202
18

19  [Defendant present.]

20

21              April R. Dowell, RMR, CRR
                Official Court Reporter
22               232 U.S. Courthouse
                 Louisville, KY 40202
23                (502) 625-3779

24  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
25

1          (Begin proceedings in open court 11:02 a.m.)

2          THE CLERK:  United States of America versus Elias

3     Estephane, Case Number 3:16-CR-148-TBR.  We're here for

4     sentencing.

5          MS. GREGORY:  Amanda Gregory and Stephanie Zimdahl

6     for the United States.

7          MR. LAMBERTUS:  David Lambertus.  I represent Mr.

8     Estephane.  He's present and seated here at counsel table.

9          THE COURT:  We're here today for a sentencing

10    hearing.  Mr. Lambertus, you and your client received a copy

11    of the presentence investigation report?

12         MR. LAMBERTUS:  Yes, sir.

13         THE COURT:  And you-all reviewed it and talked to

14    each other about it; is that correct?

15         MR. LAMBERTUS:  Yes, sir; we have.

16         THE COURT:  It seems to me in going through it,

17    there are several matters that the Court needs to consider

18    that may be in dispute; acceptance of responsibility, abuse of

19    trust enhancement, the loss.  I want -- I guess at the end of

20    it, I would need to talk about restitution if that's going to

21    be an issue also and I also may want to talk about the

22    criminal history.  And then, of course, I know you have --

23    you're asking for a variance that you'll have in your

24    discussions.

25         MR. LAMBERTUS:  Yes, sir.

1        THE COURT:  And I don't know what -- how -- what

2   order you-all want to go in that, but I just got them listed

3   here.  Won't we just take them one at time and then we -- then

4   I can rule on that as we go forward on that.

5        MR. LAMBERTUS:  Judge, would you like me here at the

6   podium or --

7        THE COURT:  Yes, sir.  I think -- is that better for

8   the court reporter?  Can you hear him well either place?

9        THE REPORTER:  Not -- not really well.  If he

10  wants -- up there is better.

11        MR. LAMBERTUS:  Okay.

12        THE COURT:  Won't we look at acceptance of

13  responsibility first.  We'll save the loss until last because

14  that's probably going to take a little bit more time maybe.

15  And I'll hear from Mr. Lambertus.  I think you're the one

16  probably requesting the two points for acceptance of

17  responsibility.

18        MR. LAMBERTUS:  Yes, sir.  Judge, a couple of

19  points, we've heard them, but just to articulate here today.

20  The Defendant never deviated from his position, his story, and

21  the provision that says if there is a statute, the issue is

22  does the statute apply.  We think the fact that the jury was

23  unable to reach a verdict on the applicability of two

24  statutes -- or same statute, two counts, shows that there was

25  a legitimate question as to the applicability of that and

1   therefore he -- the Defendant did not put the Government

2   through a sham trial or didn't put up a false defense of alibi

3   or whatever things -- in other words, did not just abuse the

4   system in any way.

5       He -- yes, he went to trial.  I know normally that

6   does not allow for acceptance of responsibility.  Here because

7   of the inability of a jury to find that he had violated that

8   statute coupled with the fact that he did testify and

9   basically admitted the facts in question, I mean, with some

10  dispute certainly, but, again, did not put up a defense of

11  didn't do it or whatever, so I think that two points is

12  appropriate.

13      THE COURT:  Ms. Gregory?

14      MS. GREGORY:  We strongly disagree.  I'm unaware of

15  any case law that says that if a jury is split on certain

16  counts, that the Defendant should then get acceptance of

17  responsibility.  The main admissions that he made with respect

18  to the actual crime were not made on his direct examination,

19  they were made on cross-examination and with one case after --

20  it was only after an initial denial, so that's different than

21  getting up there and accepting responsibility.

22      That would also put him in the same position as

23  other people in this district who have been charged with this

24  same crime and who have had pled guilty and saved the United

25  States the expense of trial.  And he wasn't fully admitting to

1   what he -- the crime here because while he would admit to

2   certain elements of it, he in essence was denying that his

3   behavior was fraudulent.

4        THE COURT:  Anything else?

5        MS. GREGORY:  No.

6        THE COURT:  Thank you.  All right.  Well, the issue

7   is whether or not the Defendant should receive two-point

8   deduction for acceptance of responsibility pursuant to

9   sentencing guideline 3E1.1.  Essentially the Defendant argues

10  he took -- the Defendant argues that he took the stand and

11  essentially admitted to certain elements of the offense.

12       Also the -- argues that the Defendant -- that the

13  jury was unable to reach a verdict on counts two and three

14  which indicated in part that Defendant's testimony on his own

15  behalf was likely relevant and beneficial and he argues that

16  he clearly demonstrated acceptance of responsibility.

17       Application note two states that this reduction is

18  available to a defendant who exercises his right to a trial in

19  order to challenge the applicability of a statute to his

20  conduct.

21       I'm not so sure that I agree with the Defendant.  I

22  think I disagree with the Defendant; that he had a full

23  admission during the course of his examination.  I kind of

24  remember the testimony somewhat differently.  He did make some

25  admissions that certain conduct would have been fraudulent,

1   but he didn't per se admit that he did some of the conduct as

2   I remember his testimony.  His admissions were somewhat

3   reluctant.  Defendant attempted to deny his fraudulent

4   conduct, I thought, by acting as though he was kind of a Robin

5   Hood.  He was helping the poor in robbing from the rich to

6   help these poor on these food stamp issues.

7        He did admit somewhat reluctantly that he knew it

8   was illegal for him to pay cash for the food stamps, but I

9   felt he left the impression that he did not do that -- simply

10  establishing a smoke screen of emphasizing his benevolent

11  behavior without admitting his criminal behavior per se.

12       And I find that the Defendant's objection -- I'm

13  going to overrule that objection.  I do not believe he's

14  entitled to a two-point departure pursuant to 3E1.1 for

15  acceptance of responsibility.  He did not come close to making

16  a full admission in my mind.

17       Let me talk about the abuse of trust guideline.

18  That's 3B1.3.  The Government is arguing for that.  And let

19  me -- I'll let you go first on that, Ms. Gregory.

20       MS. GREGORY:  Yes, Your Honor.  This is a guideline

21  that we found applicable in other cases in other circuits when

22  we were researching a separate issue and we believe it applies

23  here.  The Defendant was placed in a position of trust by the

24  government when he applied to become an approved vendor in the

25  food stamp program.

1          This isn't an automatic process.  During trial we

2     saw sort of the application that he had to put together.  We

3     saw that USDA would then come in and inspect the store.  And

4     we saw that once he was approved to be a vendor in the

5     program, he was given a lot of discretion and he was given the

6     benefit of having government funds directly deposited into his

7     store's bank account.

8          Because of the nature of the program, there's not

9     that much oversight.  We heard Mike Skaer from F&S testify as

10    to how they try to detect fraud by looking at numbers, but

11    given the number of stores, they can't go in constantly and

12    inspect the stores once they're approved.

13         The Defendant was given the responsibility of

14    training personnel at his store on the appropriate way to

15    process food stamps and the restrictions of the food stamp

16    program.  And actually one of the defense witnesses who had

17    worked there for a period, I believe testified that he in fact

18    did tell him that you weren't supposed to trade cash for food

19    stamps, but the Defendant abused this trust of the U.S.

20    Government and violated the program knowingly even after

21    having signed this certification saying that he would not.  In

22    our sentencing memo even though we sign -- we cite some cases

23    to this effect.

24         They are from other circuits, but there was one case

25    that we cited that was in the Sixth Circuit where they did not

1    specifically consider this enhancement which was odd because

2    the court did talk a lot about the fact that the case involved

3    an abuse of trust and departed upward on that basis.

4              THE COURT:  Mr. Lambertus?

5              MR. LAMBERTUS:  Judge, as to the law, I don't think

6    there's anything in the Sixth Circuit that speaks to this.  I

7    would just suggest to the court that if Mr. Estephane was in a

8    position of trust, then virtually anybody at all from the most

9    basic menial task of running a cash register becomes a

10   position of trust, so I think it would be a broadening of

11   the -- of the note.

12             THE COURT:  I note and I agree somewhat with what's

13   contained in the Government's brief; that the sentencing

14   guidelines provide that Defendant's calculated offense level

15   should be increased by two level if the Defendant abused a

16   position of public or private trust in a manner that

17   significantly facilitated the commission or concealment of the

18   offense.

19             The commentary of that provision states that public

20   or private trust refers to a position of public or private

21   trust characterized by professional or managerial discretion

22   substantial discretionary judgment that is ordinarily given

23   considerable difference.

24             Personnel holding such positions ordinarily are

25   subject to significantly less supervision than employees whose

responsibilities are primarily nondiscretionary in nature.
The level of discretion employed -- according employees to be
the decisive factor when deciding if the employee holds a
position of trust within the meaning of 3B1.3.

Courts have routinely applied the abuse of trust
enhancement to owners of stores fraudulently redeeming food
stamps, and the Government did cite a couple
out-of-jurisdiction cases in that regard.  I read the cases.
They -- I mean, they were right on point in that regard.

I didn't find anything per se in the Sixth Circuit
ruling on that, but in remembering the testimony in this case
and that he is -- he was the gatekeeper as to -- on this.  He
had these -- and that he was it.  The Government provided --
let him be a -- involved in the SNAP program and the condition
was that he couldn't sell it -- he couldn't buy food stamps
for cash.

And he's -- whereas I'm fairly sure that the people
that were getting food stamps -- at least the testimony I
heard was it was not unusual for them to trade them among each
other.  When they came to trade them for cash at a food stamp
approved facility, he had the sole discretion on whether to do
it or not and the government placed the trust in him to do
that and in return he got the business.

It seems -- I believe that the abuse of trust
provision enhancement does apply in this case.  That will be a

1  two-point enhancement.

2       The next area I think we need to talk about is --

3  has to do with the amount of loss.  And I will hear -- I'll

4  let the Government go first and let the Defendant respond as

5  to where they think the amount of loss should fall.

6       MS. GREGORY:  Yes, Your Honor.  In our sentencing

7  memo, we set forth some examples of ways that other courts

8  have found the loss calculation in this case.  It's impossible

9  to be precise, but they generally follow a similar store --

10  comparison store model.

11       Here in this case, when we were sort of discussing

12  comparison stores at the pretrial stage, Mr. Lambertus made

13  what we thought were some valid points about the fact that in

14  the particular area that The Meat Store was located, the --

15  there might be a higher proportion of food stamp users.

16       So while we did the comparison store analysis and we

17  attached that as an exhibit to our sentencing memo which would

18  result in a loss of a little over 2 million, we also looked at

19  some other comparison statistics and specifically we looked at

20  the amount of -- the average transaction amount for each SNAP

21  transaction at The Meat Store versus meat and poultry stores

22  across the state.  There it was a comparison of approximately

23  $44 versus $66, and so --

24       THE COURT:  When you made that comparison, was that

25  just as to meat stores; that's all they sold?

1          MS. GREGORY:  Yes.  Meat and poultry stores.  Yes.

2     And in Kentucky.

3          THE COURT:  Yes.  Okay.

4          MS. GREGORY:  So we then used that sort of

5     proportion compared to his total sales and came up with a loss

6     for the period that is $739,883.77.  And we believe that this

7     is supported by other things.  The -- as we cite in the

8     sentencing memo and as noted in the PSR, two store employees

9     including the Defendant's son were asked about the relative

10    proportion of fraudulent business versus legitimate meat

11    sales.

12          His son who would obviously have an incentive to

13    sort of understate the amount, estimated the fraud was

14    probably 15 percent, so we believe that should really be a

15    baseline of the total sales -- 15 percent of the total

16    sales -- but Mr. Chisem who testified and in his interviews

17    estimated initially that it was about 35 percent and then

18    later said probably 20 to 30 percent.  And that percentage

19    would be very close to what we got from the comparison of the

20    average transaction amounts.

21          If you look at the other evidence that was presented

22    at trial, when we had the undercover transactions, these were

23    for large dollar amounts sometimes involving multiple cards.

24    And you could see that the Defendant was wasn't taken aback or

25    shocked by this.

1    The one day that we did full surveillance from open

2 to close of the business, we identified $2,500 worth of

3 transactions that appeared to be fraudulent.  And by those,

4 I'm highlighting the ones where there were large amounts -- or

5 large transaction amounts of 700, 600, $530 and the individual

6 only leaves the store holding one bag which is the pattern

7 that we saw from the undercover transactions and also from --

8 also we heard about from Mr. Chisem's testimony and also the

9 transaction that took place that was manual when he -- or when

10 he was alone in the store.

11    So from -- just anecdotally from that, that's just

12 one day.  That's $2,500 in fraudulent transactions.  That

13 number would probably result in a higher loss amount than

14 we're estimating, but it would certainly support the idea that

15 a significant portion of the Defendant's SNAP sales are

16 fraudulent.  And we would argue that 33.9

1     percent or around there is a good estimate.

2          THE COURT:  Thank you.  Mr. Lambertus?

3          MR. LAMBERTUS:  Judge, I know you heard the proof as

4     well as we did, but I would like to just mention something

5     about the one day of surveillance.  The Government neglects to

6     mention that everybody agreed -- everybody -- that they had a

7     delivery truck at the store and they delivered meat regularly,

8     constantly, all day.  Everybody agreed with that.  So the one

9     day of people leaving after having charged some meat without

10    bags of meat should not go against the Defendant.  That's what

11    he had a delivery truck for, so I think that that is

12    misleading to say the least.

13          Witnesses' estimates.  First of all, I don't believe

14    any of them actually testified to any of these estimates,

15    first of all.  They may have said it in some briefing

16    somewhere, but I don't think any of them testified.

17          Regardless of where it came from, that is about as

18    unscientific as humanly possible.  Some part-time people took

19    a wild guess -- excuse me -- and we have no idea of the

20    circumstances of that -- that questioning and that statement.

21          Also, Judge, the comparison science here.  I

22    understand the Government wants to think that these were meat

23    stores.  We've never seen what stores they were.  Are they

24    really meat stores?  Do they only sell meat?  All we know --

25    or all I know certainly is that's what this store did.  And I

1  personally don't think that having a standalone meat store is

2  a common thing across the state of Kentucky.

3         And it wouldn't take much in terms of along with

4  your pork chops to get some cans of beans and things to reduce

5  the average sale by a substantial amount.  We know whatever

6  was charged or purchased in whatever form at The Meat Store in

7  this case was meat.  He didn't have lettuce.  He didn't have

8  beans.  He didn't have anything that is obviously far less

9  expensive and would have a great difference.

10        So, again, without the -- without the absolute,

11  "Here is the store.  We've examined it.  We've analyzed it and

12  they do nothing but meat," I think those are just false

13  comparisons.  So I think that comparison is faulty.

14        And maybe this is the time to mention this.  We've

15  tried to say this in various places and I don't want this to

16  sound as if in any way I'm arguing that this is not a crime.

17  We agree it's a crime.  But to start talking about loss here

18  and just comparing it to whatever number the Court thinks, I

19  think that's very misleading.  If a bank teller steals

20  $500,000, that is very simple.  500,000.  Bank teller was

21  enriched by 500,000.  Bank is down 500,000.

22        Here it's a little bit different.  Congress has

23  said, "Poor people, we're going to give you something.  Buy

24  meat with it."  In this case, poor people decided "Today I

25  need gas and electric money" or "I need money for diapers.

1    I'm going to get some money off of my meat card -- or my food

2    card."  Not good, but the Defendant was not enriched by that

3    and the Government --

4         THE COURT:  Well, he got paid -- he got paid the

5    full amount and he paid 50 cents for it per dollar.

6         MR. LAMBERTUS:  Well, if he got a hundred dollars on

7    meat --

8         THE COURT:  He made 50 dollars off that.

9         MR. LAMBERTUS:  -- he gave them 50 back, right?  Out

10   of the 50 he kept he still has to pay for his building, his

11   insurance, his employees, his freezers, and everything else.

12   So I grant you that some of it he got netted out -- I mean, he

13   had to pay taxes on it, so whatever -- unlike the bank teller

14   not paying taxes on it and just stealing from somebody.

15        The government didn't spend an extra penny.  Nobody

16   got anything stolen from them.  And whatever he was enriched

17   is at a minimum -- or maximum maybe 20 percent of what he

18   actually kept when you take out all of his expenses and him

19   paying taxes on it and of course giving half of it back to the

20   person.

21        So I really think that whatever number the Court

22   comes up with, I'll -- at that point I would say, All right.

23   Well, Judge, look now, he gave half of it back immediately.

24   He had all the expenses of a normal business to come out of it

25   and he paid the taxes on it.  So whatever he was enriched,

1     it's a very minor point, but nobody really lost any money.

2          I'm sure Congress is angry that the poor people

3     didn't do what they were supposed to do with the food stamp,

4     but they did that on their own.  He broke the law.  Again, I

5     say that.  He knows it.  I'm telling you I believe it too.

6          But it's just a little different to compare the loss

7     factor as we do theft cases and bank robbery cases.  You know,

8     whatever somebody gained by getting it from another person, I

9     just think this is vastly different than that.

10          THE COURT:  I agree -- I don't know if I agree with

11    you entirely on that, but there's some -- there is a

12    difference in the sense that you know the exact dollar amount

13    in an embezzlement case.  In this case, by all case law and

14    by -- both parties agree, it's hard to calculate.

15          MR. LAMBERTUS:  Yes, sir.

16          THE COURT:  I agree with that.

17          MR. LAMBERTUS:  We're just taking wild guesses.  But

18    I do think it's important to distinguish -- to get it off of

19    the chart, so to speak.  That chart is for the normal theft

20    case, the normal embezzlement case.  This is not one of those.

21          THE COURT:  Yeah.  But, I mean, the case law seems

22    to indicate that when food stamp benefits are exchanged for

23    cash, the loss is the face value of the benefits exchanged.

24          MR. LAMBERTUS:  Well, I understand that, Judge, but

25    I'm -- my argument is what I will call, I hope, common sense

1    or reality.  They can say that that's the loss but it's not

2    really and it's not a loss at all.  The people didn't then go

3    back to the food stamp people and say, "Oh, I lost my card.

4    Replace it for me."

5          That would be good ole fraud like we see all the

6    time and that's a hundred percent.  That's dollar for dollar.

7    This is not that.

8          THE COURT:  Ms. Gregory, any comment on that?

9          MS. GREGORY:  Yes.  We would argue that while the

10   Government isn't always the most sympathetic of fraud victims,

11   that when funds are misused, that is a loss to the government.

12   And here because he was charging -- or he was paying 50 cents

13   on the dollar.  Even though as we all saw at trial, all of

14   these people testified that they willingly entered into this

15   transaction and even though Ms. Zimdahl in asking them

16   questions asked if they would like to get a better rate and

17   they were basically so used to their lot and the situation and

18   what the market rate was that they wouldn't say, "Oh, I

19   deserve a better rate" or "I prefer a better rate, though."

20         It would be common sense as Mr. Lambertus has said

21   is of course they would like a better rate for their food

22   stamps.  That money once it's being exchanged for cash and

23   once he's keeping 50 percent of it, that's money that's not

24   being used on food.  That's the intent of the program, but

25   that's also where -- how are they getting food for that month?

1    Maybe they need something else, but he's charging them 50

2    cents -- or he's paying 50 cents on the dollar, so that's 50

3    percent of their food stamps that they're not getting.

4          Addressing some of his more specific points that he

5    made with respect to our surveillance.  To clarify the

6    anecdotal day where we did all surveillance for that entire

7    day, we are only highlighting -- with the exception of the one

8    transaction that took place when no one was there, we're

9    highlighting when someone made a large purchase and left

10   carrying one bag because based on what we saw with our

11   undercovers and based on what we heard from the employees,

12   this would be indicative of fraud.  If they left with no bags,

13   that would make more since for a later delivery, but why would

14   they leave with one bag.

15         So, again, and both the surveillance and the

16   statements by Mr. Chisem, they're not meant to stand alone.

17   They're merely meant to corroborate the estimate that we've

18   derived and they do.

19         THE COURT:  Let me ask you a question.  Restitution

20   may be related to this too.  Is the Government going to

21   request restitution in this matter?

22         MS. GREGORY:  Yes, Your Honor.

23         THE COURT:  And what -- what's the amount you're

24   going to request?

25         MS. GREGORY:  Whatever you determine to be the final

1    loss amount.

2            THE COURT:  So you're essentially thinking they're

3    the same amount?

4            MS. GREGORY:  Yes.  And I would add that courts have

5    been consistent in that even in the cases in this district.

6            THE COURT:  Yeah, I understand that.  Well,

7    obviously the loss calculation is a big factor in this case

8    because if it's over $550,000 -- between $550,000 and $1.5

9    million, it's a 14 percent increase.  If it's between 250,000

10   and $550,000 it's -- not 14 percent.  It's a 14 point

11   increase.  And if it's between 250,000 and $550,000, it's a 12

12   point increase.

13           In the United States sentencing guidelines

14   2B1.1(b)(1), the court increases the offense level based on

15   that amount of loss cause by defendant's conduct including the

16   acts and omissions of others.

17           I believe that relevant to this matter, the loss

18   amount under the guidelines is the reasonably foreseeable

19   pecuniary harm that resulted from the offense.  And I don't

20   think any party's really disagreeing with that.  You just come

21   at a different figure when you-all talk about it.

22           Here the Defendant's bank account received money

23   credits from the USDA in amounts equal to the benefits

24   purchased for cash while the Defendant only paid out half the

25   value of the benefits to recipients in cash.  The full value

of the benefits is the amount that is used to calculate the
fraud loss.

And a case involving governmental benefits loss
shall be considered to be not less than the value of the
benefits obtained by the unintended recipients.  Case law
seems to support the position that when food stamp benefits
are exchanged for cash, the loss is the face value of the
benefits exchanged.

Case law cited by the Government and I think
probably agreed to by the Defendant is in a case like this,
it's impossible to determine the exact amount of the fraud
loss.  And that's a big part of the Defendant's argument in
this case.  But the Court must do -- what the Court is
required to do is make a reasonable estimate of the loss given
the available information available to the Court.  And the
Defendant -- the Government in their brief cites several cases
that talk about using comparable sales and doing other matters
which to reach the decision in this case.

The Government talks about that the using comparison
store method, that that might not necessarily be fair to the
Defendant in this matter.  They come up with over a two
million dollar loss in that regard.

The Defendant's meat store is located in the west
end of Kentucky which is I think likely to have a large number
of SNAP recipients compared to many other parts of Louisville.

In the presentence investigation report, the -- it's noted on
paragraph nine that according to the Government, it's not
possible to determine the exact amount of fraud loss through
SNAP benefit trafficking.

The Government states courts have used a variety of
methods to determine the fraud loss.  I think that's true.
From January 2012 through July 2016, the total for SNAP
transactions at The Meat Store was $2,182,547.85.  It's the
position of the Government that the total fraud loss is around
$700,000.  The Defendant disagrees with that.

From January 21 -- the report goes on to state, From
January 2012 through July 2016, the statewide average SNAP
transactions amounted for all meat and poultry stores in the
state including The Meat Store was $43.75.  During the same
period, the average SNAP transaction amount for The Meat Store
was $66.15.

Several people testified that The Meat Store prices
were cheaper than average.  Assuming the difference between
the two average SNAP transactions amounts is due to the
trafficking of SNAP benefits at The Meat Store, then 33.9
percent of The Meat Store SNAP sales were fraudulent.

And utilizing the 33.9 percent figure which the
total SNAP transaction being the $2 million figure I mentioned
a moment ago, then the loss amount is almost $740,000.

Also there are other ways, I think, we can look at

1    in this.  I think that -- that is a calculation that

2    considering the difficulty of coming to an exact calculation,

3    that is one way to approach it that's mentioned in the

4    presentence investigation report and you could say it was

5    reasonable.

6            However, there are other estimates that were made.

7    I know that the -- these were probably -- I don't remember

8    what Mr. Chisem said at trial, but I think these were taken

9    from his statements he made to the Government prior to trial

10   and what Defendant's son made prior to the trial.  I'm pretty

11   sure that figure was brought to his attention at the time of

12   trial.  I don't remember what he finally admitted to in that

13   regard.

14           But in any event, I think all those were estimates

15   made at one time.  While they may be unscientific, they are

16   estimates of people who worked there and they are lower than

17   the estimate made by the -- in the Government's calculation.

18           The son indicated -- Anthony Estephane estimated

19   that 15 percent of the sales at The Meat Store involved the

20   exchange of cash.  Mr. Chisem estimated at one time 35

21   percent, then later said he thought it was between 20 and 30

22   percent.

23           If you were to take the 33.9 percent, the 15

24   percent, the 35 percent, the 20 percent, and the 30 percent

25   and average those out, it would come out to about 26

1    percent -- 26.78 percent of the sales were in that -- were in

2    that.  And I think that takes into consideration all the

3    estimates I've seen and the suggested estimate that has some

4    reasonableness to it, I believe, that the Government has

5    suggested.

6    Having said that, that figure would be almost

7    $585,000.  I still think maybe that's a little bit on the high

8    side.  Giving some benefit to the doubt in this matter to the

9    Defendant, I'm going to make a determination that the amount

10    of -- and this affects guidelines too -- and it's really where

11    I think -- is one of the reasons I'm doing it -- of $545,000

12    of loss and that would equal to restitution in this matter.

13    The other issue before the Court involves the

14    criminal history.  I believe in looking at that, Defendant

15    gets two criminal history points, one for disorderly conduct,

16    misdemeanor charge, in July of 2009 and the other for selling

17    packaged alcohol on drink license premises, bootlegging, in

18    September of 2009 and that makes him a criminal history two.

19    I think that saying he's a criminal history two

20    significantly overrepresents the seriousness of his past

21    criminal conduct and I intend to sentence him in regard to a

22    criminal history of one in that regard.  I'll be glad to hear

23    any other arguments that you wish to make, Mr. Lambertus, in

24    this matter.

25    MR. LAMBERTUS:  As to any -- all topics, Your Honor?

1          THE COURT:  Yes, sir.

2          MR. LAMBERTUS:  All right.  Judge, we are asking for

3     a sentence outside the guideline range.  The Court's in a

4     great position to appreciate the human condition here.  You

5     heard the trial.  I think it's reasonable to think that Mr.

6     Estephane frequently thought he was doing the right thing as

7     opposed to thinking he was doing the wrong thing when he was

8     giving people cash back on these cards.

9          I've already mentioned the argument that even though

10    the statute and the case law might seem to go one way, I still

11    think the reality of a loss figure is far different than what

12    the law might seem to say.  Also, Judge, and I didn't touch on

13    this before, we did supply the Government in advance of trial

14    and for the preparation of the presentence report the proof

15    that during the time of the indictment period, Mr. Estephane

16    did purchase -- and the records weren't great -- but at an

17    absolute minimum at least a million six or a million seven in

18    meat that he actually purchased.  So that's a substantial

19    amount.  That's what he paid for it, so obviously, you know,

20    he's entitled to expenses and profit, so on.

21          I say that just so the Court doesn't think that this

22    was just a total sham operation.  I mean, he absolutely ran a

23    thriving meat -- that's a lot of meat to sell during that

24    period of time.  So I distinguish that from a criminal

25    enterprise where the whole purpose is to steal and enrich

1    yourself.

2          And finally to the enrich yourself.  You can see and

3    you heard the case, he did not enrich himself.  He -- there's

4    not a shred of proof that he spent lavishly, gambled, drank,

5    did drugs, did anything like that.  He has absolutely no

6    assets.  Filed bankruptcy during this period.  The Court also

7    heard into the indictment period, his building collapsed

8    causing him to lose everything; the building, the meat, the

9    freezers, everything.  That was a disaster for him.

10          So nevertheless, he's done a great job raising three

11    children; one's a doctor; one's a tradesperson, butcher; the

12    other one's in Speed school here.  So I know those are all

13    human factors that don't fit too well, but if the Court's

14    going to give a sentence outside the guidelines, I would think

15    that it would be important to note that he's had many good

16    things that he's done in his life.  And the Government's own

17    witnesses were pretty good witnesses for a sentence outside

18    the guideline, I thought.  They fell all over themselves to

19    say what a great guy he is and kind and generous, so -- I

20    think that's -- that's our summary, Judge.

21          THE COURT:  All right.  Ms. Gregory?

22          MS. GREGORY:  We do not believe that the case

23    warrants an outside-of-guideline sentence.  We would argue for

24    a sentence in the middle of the guideline range.  I think with

25    the Court's adjustments, we are now at 20, category 1, which

1    would be 33 to 41.  We would argue for something in the middle

2    there around 37 months.

3            The -- with respect to this idea that the Defendant

4    didn't enrich himself because he declared bankruptcy, well, as

5    the defense counsel just explained, he -- his building

6    collapsed which resulted in killing someone and losing his

7    inventory and that is the reason he declared bankruptcy.  It's

8    not because he wasn't running a profitable business.

9            The -- one of the sentencing factors under 3553(a)

10   that's not discussed either by defense counsel or I because it

11   didn't become relevant until we -- the Government realized he

12   was arguing for home incarceration, but it's the need to avoid

13   unwarranted sentencing disparities among defendants with

14   similar records and similar conduct.

15           I mean, that's generally the purpose of the

16   guidelines at all, but we would point out that the two other

17   food stamp fraud cases in this district both which resulted in

18   pleas versus trials, those defendants were sentenced to time

19   in prison.

20           The nature and circumstances of this offense are

21   serious.  Like the defense counsel and Defendant at trial kept

22   trying to downplay it, but this is a very important government

23   program that's supposed to help poorest members of society and

24   supposed to help them obtain food.

25           And while sometimes restrictions in the program may

1  be inconvenient, fraud on the program undermines public faith

2  in the program, it creates cause for people who are opposed to

3  the program to get rid of the program and endangers the

4  program as a whole.

5          Even though none of the customers who were

6  testifying really viewed themselves as being taken advantage

7  of, the Government takes a different view; that when they're

8  only paid 50 cents on the dollar for the benefits, that they

9  are being taken advantage of at a really usurious profit rate.

10          And as has been stated, you know, this is -- the

11  Defendant in this case, he had a number of stores over a long

12  period of time all of which were -- qualified under the SNAP

13  program.  And despite this, he -- you know, during this period

14  we were able to detect that he was violating those rules and

15  defrauding the government and really taking advantage of these

16  customers.  For these reasons, we think a midlevel sentence of

17  37 months is appropriate.

18          THE COURT:  Does your client wish to make any

19  comments, Mr. Lambertus?

20          MR. LAMBERTUS:  Judge, I'm authorized to tell you

21  that he's very remorseful and accepts the Court's decision.

22          THE COURT:  That's fine.  Thank you, sir.

23          The Court will now state the sentence.

24          Court having considered the advisory sentencing

25  guidelines in 18 United States Code 3553(a) imposes the

1    following sentence.  It is the judgment of the Court that the

2    Defendant's committed to the custody of the Bureau of Prisons

3    for a term of 33 months as to count one in the indictment.

4    Upon release from imprisonment, the Defendant shall be placed

5    on supervised release for a term of three years as to count

6    one.

7         The Defendant shall abide by the standard of

8    conditions of supervision adopted by the court as well as

9    special conditions of which a copy has been provided to

10   Defendant and counsel.  These special conditions include

11   certain financial restrictions and payments or restitution all

12   of which shall be explained by the United States probation

13   officer.

14        It is further ordered the Defendant to pay

15   restitution in the amount of $545,000, any interest

16   requirement on the imposed restitution is waived.  Defendant

17   shall pay a special penalty assessment fee of $100 as to the

18   single count of conviction.  Any financial sanctions imposed

19   shall be paid in accordance with the scheduling of payments

20   page contained in this judgment.

21        A fine and cost of incarceration and supervision are

22   waived due to Defendant's inability to pay.  Court determines

23   that Defendant has a low risk of substance abuse and mandatory

24   drug testing is hereby suspended until further order of the

25   Court.

1          Having considered 18 United States Code 3553(a) and

2     the advisory guidelines which produce a total offense level of

3     20 with a criminal history category of one as determined by

4     the Court.  The advisory guideline ranges are 33 to 41 months

5     custody, a fine of 15,000 to 150,000, and one to three years

6     supervised release.

7          A sentence of 33 months custody followed by three

8     years supervised release and payment of restitution falls

9     within the advisory guidelines as established by the Court

10    today and is sufficient but not greater than necessary to

11    comply with the purposes set forth in section 3553(a)(2) and

12    satisfies the statutory provisions.

13         Although I didn't vary from the guidelines that I

14    found, I made some -- I think some benefit of the doubt

15    findings in regard to deciding what the guidelines would be

16    and the criminal history and the amount of loss is in this

17    matter.  And so that's what I took into consideration.

18         Are there any objections to sentence pronounced or

19    special conditions imposed all of which shall be incorporated

20    in the judgement on behalf of the United States?

21         MS. GREGORY:  None other than those already stated,

22    Your Honor.

23         THE COURT:  Anything -- any objection on behalf of

24    the Defendant?

25         MR. LAMBERTUS:  Not other than all the things we've

1    argued, Judge.

2        THE COURT:  Under the -- any objection to Defendant

3    voluntarily surrendering?

4        MS. GREGORY:  No, Your Honor.

5        THE COURT:  We'll allow Defendant to voluntarily

6    surrender.  He may appeal this sentence if he wishes to do so.

7    If he can't afford an appeal, he may petition the Court to

8    waive any filing fee in that regard and the Court would

9    consider that motion.  That must -- if he's going to appeal

10    it, he needs to file a motion to appeal it within 14 days

11    after I enter an order setting his sentence.  I will recommend

12    he be housed in a facility as close to his family as possible.

13        MR. LAMBERTUS:  Thank you, Judge.

14        THE COURT:  Anything further on behalf of the

15    Defendant?

16        MR. LAMBERTUS:  No, sir.

17        THE COURT:  On behalf of the United States?

18        MS. GREGORY:  No, Your Honor.

19        THE COURT:  Thank you.

20        MS. GREGORY:  Thank you.

21

22

23

24

25

1    (proceedings concluded at 11:49 a.m.)

2                   C E R T I F I C A T E

3         I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

4    THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

5

6
          _____s/April R. Dowell_____          ___3/6/18__ _____
7    Official Court Reporter, RMR, CRR               Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25